*Hall-Rayford* et al. *v. Owens* et al.,

# Exhibit C to Plaintiffs' Verified Complaint for Civil Rights Violations

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

MONIQUE OWENS,

        Petitioner,                                 Case No. 2022-002271-PH

v.

HARVEY CURLEY,

        Respondent.

---

## **OPINION AND ORDER**

This matter is before the Court on Petitioner Monique Owens' ("Petitioner") Petition for a Personal Protection Order ("Petition") pursuant to MCR 3.701 et seq.

### **BACKGROUND AND PROCEDURAL HISTORY**

This case arises out of the alleged behavior of Respondent Harvey Curley ("Respondent") while attending a public event held in the City of Eastpointe, MI ("City") on June 18, 2022. On June 22, 2022, the Petition was filed with a copy of a police report dated June 19, 2022.

On June 23, 2022, the Court entered an Order denying the request for an ex parte personal protection order ("PPO"), for the reason that the Court needed more evidence in order to evaluate the request. On August 15, 2022, almost two months after the Petition was filed, the Proof of Service was filed, showing service upon the Respondent took place on August 10, 2022 at 1:53 pm. The matter was then scheduled for, and proceeded to, a hearing on August 23, 2022.

At that time, the Court heard testimony from four witnesses: Petitioner, Respondent, Mr. Eric Lloyd (on behalf of Petitioner) (one of the religious dignitaries present), and Ms. Sheila Ulinski (on behalf of Respondent) (one of the event's board members present). Following the

1

testimony and arguments made by the parties, the Court took the matter under advisement to issue this Opinion and Order.

## SUMMARY OF TESTIMONY

Petitioner is the Mayor of Eastpointe. Respondent is an Eastpointe City Council Member. As Respondent testified, he was the chairman/event planner for the opening ceremonies of the annual "Gratiot Cruise", which is where the described incident took place.

According to Respondent's testimony, this event was supposed to be apolitical in nature, as it had been for the prior 23 years that he has been its chairman. As Respondent indicated, he had several speakers scheduled for the event, but did not invite the Petitioner to speak, and she was not listed on the event's program.

As described by both Petitioner and Respondent, a stage for the event's dignitaries was set up in the parking lot of Eastpointe High School. Respondent testified that between 11:00 am and 12:30 pm, he and the program's speakers were on the stage while speeches and prayers were being given. At one point, the timing not being clearly established by the testimony given, Petitioner testified that she made her way up to and sat on the stage. She admits that she had not planned on addressing the crowd at the event. Given the COVID pandemic, Petitioner testified this was the first Gratiot Cruise she was able to attend in her official capacity as Mayor.

Toward the end of the scheduled program, Mr. Lloyd (one of the religious dignitaries present) testified that he saw Pastor Freeman, another religious dignitary, approach Respondent on the stage while Respondent held the microphone in his hand. Mr. Lloyd further noted that while not hearing specifically what was discussed between them, shortly after the conversation started Mr. Lloyd heard Respondent yell out over the microphone a loud "NO!"

At that point, Respondent testified that he gave his closing remarks and ended the program. Mr. Lloyd testified that Petitioner then walked over to the microphone and began addressing the crowd. Petitioner testified that earlier she was urged on by one of the other religious dignitaries to speak, which she initially declined. However, Petitioner further stated that she was later urged to speak by the DJ in charge of the event's music program. Petitioner testified that she chose to make a few non-political remarks. Respondent does not dispute the nature of Petitioner's remarks.

During his testimony, Respondent admitted that he got "mad" that Petitioner was speaking. Mr. Lloyd testified that as Petitioner finished her remarks, he saw Respondent throw down a clipboard and punch a stage wall with a closed fist. As Petitioner testified, Respondent then immediately, and in an extremely aggressive and confrontational manner, started yelling and screaming at her on the stage. Petitioner further testified that as she began to move away from Respondent toward the stairs, he ran around a table with his hands up in a threatening manner and continually yelled and screamed at her "who do you think you are?" Mr. Lloyd testified he heard Respondent yell at Petitioner that "you were not invited to speak!" and "what do you think you're doing, this is not a city event." As Petitioner and Mr. Lloyd noted, this all happened in front of a large crowd of people gathered around for the event.

Petitioner testified that she then went down the stairs and that Respondent followed her. Mr. Lloyd testified that all of a sudden he heard Petitioner say, "Bishop, can you help?" At that point, Mr. Lloyd testified that he saw Respondent "in [Petitioner's] face with his hands up". Mr. Lloyd testified that he got in between them. Petitioner testified that she kept asking Respondent to put his hands down, but he kept saying, "I don't give a damn!" and "no one tells me what to

3

do!" Mr. Lloyd further testified that Respondent would not put his hands down despite repeated requests to do so.

Mr. Lloyd further testified that he felt that Respondent was an absolute threat to Petitioner. He stated that he "saw the fear on her face, like a deer caught in headlights". He then testified that he could not stop or calm down Respondent and that he was just trying to separate them as Respondent kept pointing his finger in her face.

This is all with the backdrop that as previously testified to by Mr. Lloyd, he has known Respondent over the years, likes him, had never seen him act this way before, and that such was totally out of character for him. Nonetheless, Mr. Lloyd testified that Respondent was enraged during this incident.

Mr. Lloyd testified that not only was it a hostile environment, but that Respondent was the one that was confrontational, and that he believes if he had not intervened the situation would have escalated into a physical altercation.

Petitioner, Respondent, and Mr. Lloyd testified that some of the other religious dignitaries then came over to them and coaxed Respondent away from Petitioner. Respondent testified that at this point he said, "I need to pray". Petitioner testified that she and Respondent did not see each other for the remainder of the event.

Ms. Ulinski admitted in testimony that she did not see the events as they occurred on the stage. She testified that she did see Respondent come down the stage stairs and he went right up to Petitioner. Ms. Ulinski testified that it was as if Petitioner was trying to "hi-jack" Respondent's program. Ms. Ulinski did not feel that Respondent was a threat and indicated that Respondent is animated and speaks with his hands often. Further, she noted that if Petitioner

4

was in such fear, she could have gotten the attention of any one of several police officers stationed in the area, or would have reported the incident to the police much sooner than she did.

It should be noted that there have been no reported incidents between the parties prior to or since the date of incident.

## STANDARD OF REVIEW

Except as otherwise provided in MCL 600.2950a, an action for a PPO is governed by the Michigan Court Rules. MCR 3.701(A). The decision to grant or deny a PPO is left to the sound discretion of the trial court. *Patterson v Beverwyk*, 320 Mich App 670; 922 NW2d 904, 910 (2017). Further, "[t]he petitioner for a PPO bears the burden of proof." *Id.* at 911. In this regard, in order for a court to grant a nondomestic relationship PPO under MCL 600.2950a(1), it is necessary for the petitioner to allege facts meeting the defined prohibited conduct set forth under MCL 750.411h. MCL 600.2950a(1).

Moreover, a PPO under MCL 600.2950a is "… an injunctive order … restraining or enjoining conduct prohibited under [MCL 600.2950a(1)]." MCL 600.2950a(31)(d). MCL 600.2950a(7) notes that if the court refuses to issue a PPO, it shall state in writing the specific reasons for doing so.

## LAW AND ANALYSIS

Michigan statutes provide for three types of PPOs, which are usually viewed in light of the underlying relationship had between the petitioner and respondent: 1) for a domestic relationship – MCL 600.2950; 2) for a nondomestic relationship – MCL 600.2950a(1); and 3) for a sexual assault – MCL 600.2950a(2)(a). The case at hand involves a nondomestic relationship between the Petitioner and Respondent.

Pursuant to MCL 600.2950a(1), "... an individual may petition the family division of circuit court to enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited under [MCL 750.411h]."

MCL 750.411h(1)(d) prohibits a person from engaging in action(s) that result(s) in "... **<u>a willful course of conduct involving repeated or continuing harassment</u>** of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." (emphasis added).

Under MCL 750.411h(1)(c), "harassment" is defined as "... conduct directed toward a victim that includes, but is not limited to, **<u>repeated or continuing unconsented contact</u>** that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." (emphasis added).

"Uncontested contact" under MCL 750.411b(1)(e) is defined as "... any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Uncontested conduct includes, but is not limited to, any of the following: ... (ii) Approaching or confronting that individual in a public place or on private property." Hence, actual contact with the person's body is not a requirement for uncontested contact. In the case at hand, Petitioner has not alleged that Respondent made any actual physical contact with her.

The term "emotional distress" as used in MCL 750.411h(1)(c) is defined as "... significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." MCL 750.411h(1)(b).

6

Preliminarily, Respondent's alleged conduct in this case can only be described as childish and extremely inappropriate in any setting of interaction between two adults. Even more so for an elected official attending a public event in his role/capacity as the event planner. His desire to keep the event apolitical certainly does not justify the extreme reactions he exhibited and directed toward the Petitioner for her perceived "high jacking" of the event. As a result of Petitioner speaking for approximately 5 minutes, without any political overtone in her comments, Respondent's actions toward Petitioner can only be described as having occurred for childish and/or petty motives. They far exceeded the perceived disrespect shown to him.

However, while his behavior was admittedly inappropriate, the Court must determine whether the conduct is enough to warrant the Petitioner's request for a Personal Protection Order. In this context, the Court is well aware of the parties dislike for each other, however that is not a basis to which a Personal Protection Order would be entered by the Court. Upon examining the specific facts of this case, the Court does not feel that the conduct exhibited by the Respondent warrants the issuance of a Personal Protection Order. Based on all the testimony during the hearing, he behavior of the Respondent, while socially reprehensible, also appeared to be isolated in nature. There was no evidence taken during the hearing that would demonstrate to the Court that the Respondent is dangerous or that he has exhibited this sort of behavior before. Mr. Curley was angry that the Mayor spoke during his event and he overreacted. The Court is satisfied that the alleged conduct does not constitute "repeated or continuing" conduct sufficient to satisfy the standard set forth in MCL 750.411h.

In *Pobursky v Gee*, 249 Mich App 44; 640 NW2d 597 (2001), the Michigan Court of Appeals undertook an analysis of the respondent's conduct which took place over the course of an evening at an ice arena. The conduct at issue in that case actually involved physical

7

altercation(s) to go along with repeated threats. Respondent appealed the circuit court's denial of his motion to terminate the PPO entered against him.

In reversing the circuit court, the Court of Appeals centered its attention on the definition of "course of conduct". The term "course of conduct" as used in MCL 750.411h(1)(a) is defined as "... a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose." *Porbursky*, 249 Mich App at 47. In analyzing that standard, the Court of Appeals noted:

> The statute does not define the words 'separate' or 'noncontinuous'. The word 'separate', used as an adjective, means 'detached; distinct.' *Random House Webster's New College Dictionary* (1997). The word 'noncontinuous' is a common compound word formed with non-that does not have a special meaning; it is to be understood as not continuous. *Webster's New Twentieth Century Dictionary of the English Language: Unabridged Edition* (2nd ed., 1979). The word 'continuous' is variously defined as 'joined without intervening space; without cessation or interruption; unbroken; constant; connected,' *id.*, or 'uninterrupted in time; without cessation' or 'being in immediate connection or spatial relationship.' *Random House Webster's New College Dictionary (1997)*. Thus, two or more separate noncontinuous acts are distinct from one another that are not connected in time and space.

*Porbursky*, 249 Mich App at 47.

The Court of Appeals then held that because the "... petitioner alleged a single incident comprising a series of continuous acts, each immediately following the other", being "... a series of acts evidencing a continuity of purpose, the acts were not separate and noncontinuous." As a result, the Court of Appeals concluded that the alleged conduct did not satisfy the standard set forth in MCL 750.411h(1)(a) and that the trial court erred in entering the PPO and in denying the motion to set it aside. *Id.* at 48

In this case, as in *Pobursky*, Petitioner has alleged a single incident, spanning over the course of approximately 10 minutes, consisting of a series of continuous acts, each immediately following the other. For the reasons discussed in *Pobursky*, such conduct does not rise to the

level of being actionable under MCL 600.2950a(1). The incident that occurred was isolated in nature and was a result of the Respondent overreacting to the Mayors actions. It was not conduct that is so egregious and repeated that it warrants the issuance of a personal protection order and the Court does not feel that the Petitioner needs the further protection that a PPO would provide. Therefore, Petitioner has not met her burden of proof, and the Petition must be denied.

## CONCLUSION

For the reasons discussed above, the Petitioner's Petition for a Personal Protection Order is hereby DENIED.

Pursuant to MCR 2.602(A)(3), this Opinion and Order resolves the last pending claim and closes the case.

**RACHEL RANCILIO**
CIRCUIT JUDGE

**IT IS SO ORDERED.**

SEP 1 6 2022

A TRUE COPY
ANTHONY G. FORLINI, COUNTY CLERK
BY: M. Buffa-Sylvester, Court Clerk

RACHEL RANCILIO
CIRCUIT COURT JUDGE
FAMILY DIVISION

DATED: September 16, 2022

cc: Monique Owens and Harvey Curley

9

